IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 3, 2015

**STATE OF TENNESSEE v. KERVIN JACKSON**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04457     J. Robert Carter, Jr., Judge**

**No. W2015-00134-CCA-R3-CD  -  Filed January 8, 2016**

Defendant, Kervin Jackson, was convicted of first degree murder for the shooting death of his brother-in-law.  On appeal, he argues that the evidence was insufficient to support the conviction because the State failed to establish premeditation.  After a review of the evidence and authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Monica A. Timmerman (on appeal) and Joseph McClusky (at trial), Memphis, Tennessee, for the appellant, Kervin Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman and Muriel Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

The victim, Taumarein Covington, was shot and killed on January 13, 2013, while standing in the kitchen of the home in which he lived with his wife's family, including Defendant, his brother-in-law.  Defendant was arrested shortly after the shooting.

Pearlie Campbell, Defendant's mother, owned the house where the incident took place. The modest home was occupied by multiple members of Ms. Campbell's family: Ms. Campbell; Defendant; the victim; Dominique Covington,[1] Defendant's sister and the victim's wife; and Defendant's sister Ashley Jackson and her child. Ms. Jackson and her child were not living at the residence permanently but were staying there on the day of the shooting.

Tancer Covington, the mother of the victim, testified that, about a week prior to his death, she met the victim at a bank to give him money for the first month's rent at a new apartment. During that meeting, the victim told her that he was "fearful of Dominique's brother."

The morning of the shooting, Ms. Campbell recalled sitting at the kitchen table "[w]aiting on Dominique and Ashley to get ready" to "go to the grocery store." The victim was in the kitchen sitting behind Ms. Campbell. According to Ms. Campbell:

> [Defendant] came in[,] stood by the sink[,] and asked me where I was fixing to go[,] and I told him the grocery store[,] and he asked me who was going with me[,] and I told him[,] and then he said, 'Well, it just ain't right, mama. It just ain't right.'" So you know he just kept talking so - - I mean when I bent to tie my shoe all I hear was pow, pow, and I just ran out the door.

Ms. Campbell did not actually see her son shoot the victim but "he was the only somebody in the room" other than her and the victim. She admitted that in her initial statement to police, she maintained that Defendant was responsible for shooting the victim. In fact, she described the gun that Defendant used to kill the victim as "black and may have had a little silver on it." She explained that Defendant was employed as a security guard and routinely carried a gun.

The victim and his wife, Dominique, had been staying at the house for quite some time. They were saving money to move in to their own place. Ms. Campbell knew that the victim and Dominique were planning on moving out as soon as they were "stable." While they lived at the house, Dominique and the victim slept on the floor in the living room on a blow up mattress. In order to make room for their bed, the couple had to rearrange some of the furniture in the living room. This often irritated Defendant, especially when the victim's gaming television was blocking the door.

---

[1] Because both the victim's mother, Tancer Covington, and the victim's wife, Dominique Covington, have the same last name, we will refer to the victim's wife as Dominique. No disrespect is intended.

On the morning of the incident the victim and Defendant were "arguing." Defendant was "telling him . . . he had to leave." Dominique stated that Defendant never threatened to kill the victim but there was definitely tension between the two. She admitted that in her statement to police, she commented that Defendant used the phrase "tick tock" when talking to the victim for several days prior to the incident. The victim reported to her that Defendant was "taunting [the victim] and threatening to shoot him." Dominique later explained that Defendant often used the phrase "tick tock" when "you need to do something." She did not perceive it as a threat toward her husband but thought that he was saying it because he wanted them to move out of the house. She described Defendant's normal demeanor as "mad" and opined that the victim was "afraid" of Defendant at the time of his death.

On the morning of the incident, Dominique and the victim got up around 11:00 or 12:00. After she arose that morning, Dominique was sitting in the living room listening to her iPod when she heard her mom say, "Kervin, no." After that, she heard one shot. Dominique "hit the floor and [she] heard [her] mom scream and run out the front door." Dominique ran to the front door to see where her mother was going but heard "the next couple of shots" and got back down onto the floor. After the shooting stopped, she ran in to the kitchen. She saw her brother standing there and her husband lying on the floor with blood around him. Defendant "had a gun in his hand." Dominique saw Defendant lay the gun down on the floor next to the victim's left hand. She picked the gun up and put it on the kitchen table.

Ashley Jackson was present at the home that morning but did not see anything happen. She heard the gunshots from her bedroom and dialed 911.

Officer Charles Taylor of the Memphis Police Department and his partner, Officer Jeremy Moore, responded to the shooting call the day of the incident. They received a report of a shooter, "male black, heavyset, with black pants and a black like a hoody or a sweatshirt." On the way to the scene they found a male fitting the description "just standing in a driveway." He identified himself as Defendant; his name matched that of the suspected shooter. During a pat down, officers located a .45 caliber handgun, three magazines loaded with eight rounds, eighteen loose rounds, and a towel in his right pocket. Defendant stated that he was "justified" while receiving the pat down.

Officer Donald Cavatte responded to the scene with his partner, Officer Morris.[2] When they arrived, the victim was on the floor in the kitchen with visible gunshot wounds to the head. There were shell casings on the floor. David Smith, the crime scene investigator, recovered a .40 caliber handgun from the kitchen table and logged four spent .45 caliber shell casings from the kitchen into evidence.

---

[2] The first name of Officer Morris does not appear in the transcript.

The .40 caliber handgun was purchased by Defendant at Guns & Ammo in Memphis on December 31, 2011. At the time it was purchased, Defendant had a concealed carry permit.

Sergeant Marcus Berryman of the homicide bureau interviewed Defendant after his arrest. Defendant waived his rights and gave a statement in which he admitted that he shot and killed the victim. Defendant stated that he:

> Woke up th[at] morning[,] went outside to smoke a cigarette, came back from outside, used the rest room, went to the kitchen, some words were said between him. [The victim] said I'm going to kill you if you don't do this and I'm going to stick if you don't that. My thoughts to myself is [sic] that it would be self-defense.[3] I was trying to protect my life and the lives around me. I sat back on the kitchen counter, waited about three minutes to see what he was going to say next.

Defendant stated that he "shot him and that was it. He hit the stove and fell to the ground." Defendant claimed that the victim was armed with a weapon in his left hand and was threatening Defendant with the weapon. Defendant said he "felt threatened" before he shot the victim. Defendant thought that the victim was mad because he got "jumped" by several men.

The victim died from two gunshot wounds to the head and a graze wound to the side of the head along with a gunshot wound to the right forearm shot from an "indeterminate range."

Defendant testified at trial. At the time of the incident, Defendant was twenty-eight years old and weighed about 245 pounds. At the time of trial he weighed less. He worked as a security guard for AmeriGuard. Defendant had worked as a security guard since he was eighteen years old. As part of his job, he had a concealed carry permit. Defendant admitted that he had quit his job prior to the incident.

Defendant owned two guns at the time of the crime—a .40 caliber Smith & Wesson and a .45 caliber Ruger. Defendant reported the Smith & Wesson missing in May. He claimed that he had no idea where the gun was located until he saw the victim with the gun that day.

---

[3] Out to the side in Defendant's handwriting it states "Protect yourself it is going to be." We understand this to mean Defendant amended the sentence to read, "My thoughts to myself is that it would be protect yourself it is going to be self-defense."

On the morning of the incident, Defendant got up, used the restroom, and encountered the victim, who told him he was "going to shoot [Defendant] and a family of stickers."[4] Defendant told his mother about what the victim said to him. Defendant testified:

> She said don't worry about it. She walked in the kitchen and sat down. I was walking behind her. I leaned on the counter. I walked behind [the victim] to the cupboard. I went to the T.V. area[,] leaned back on the kitchen counter. He said it again but she didn't hear it. By the time she got up, he had jumped up with his gun out so I fired.

Defendant claimed that the victim was sitting with his arms crossed. He had his gun in his left hand.[5] Defendant could not see the barrel; the gun was pointed toward the window. The victim "showed me the gun about two minutes before my mother walks out. She jumps up and runs. He jumps up and I shot him. He pulled his gun so I shot." Defendant felt "[t]hreatened [like his] life was in danger" and the lives of the "people in [his] household's [sic] in danger" because the victim had already "threatened us." Defendant admitted that the victim did not get "off a shot" and that he shot the victim four or five times. After the shooting, Defendant walked out of the room to put on his shoes. His sister Ashley and his mother told him to get out of the house. He walked "a block, . . . smoked a cigarette, used the restroom, and the police came." He was arrested and went straight to jail. He told the police that it was "self-defense." Defendant maintained that he was "skeptical" of what the victim was going to do but that he "felt threatened."

On cross-examination, Defendant claimed that he had no idea that the victim had the gun that Defendant had previously reported missing. He denied handling the gun after the victim was shot. He saw the gun in the victim's left hand and claimed it remained in the victim's left hand after he was shot. Defendant admitted that no one else saw or heard the victim threaten him.

At the conclusion of the proof, the jury found Defendant guilty of first degree murder and employing a firearm during the commission of a felony, as charged in the indictment. The trial court dismissed the charge of employing a firearm during the commission of a felony because the charge only applied if the jury found Defendant guilty of a lesser included offense. The trial court sentenced Defendant to life imprisonment. Trial counsel filed a motion for new trial. In the motion, counsel

---

[4] While it is not entirely clear what is meant by a "family of stickers," Defendant later testified that the victim stated he was going to "shoot or stick [the family]."

[5] The victim's mother testified on rebuttal that the victim was right-handed. Dominique testified on surrebuttal that her husband "could write with both hands."

challenged the sufficiency of the evidence and the trial court's denial of the motion for judgment of acquittal. The trial court denied the motion. Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence. Specifically, he claims that there was insufficient proof that he "acted with premeditation" and that the "majority of the evidence presented supports [his] theory that he acted in self-defense, or at worst acted in a state of excitement or passion." Defendant urges this Court to examine the factors set forth in *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005), and *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), in reviewing the sufficiency of the evidence for premeditation. Defendant insists that the following proof supports his argument that the evidence is insufficient: (1) only one State witness recalled Defendant's threatening the victim; (2) there was no proof that he procured a weapon to kill the victim; (3) it was disputed whether the victim was holding a gun at the time of his death; (4) the killing was not particularly cruel; (5) Defendant shot the victim four times but was arrested with multiple rounds of ammunition; (6) there was no proof that he made preparation prior to killing the victim with the purpose of concealing the crime; (7) there was no proof that Defendant attempted to destroy or hide evidence; and (8) Defendant testified that he was "really afraid" after the shooting. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Furthermore, questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). This is because the jury has "the benefit of hearing witness testimony and observing witness demeanor."

*State v. Robinson*, 400 S.W.3d 529, 533 (Tenn. 2013). As the Tennessee Supreme Court explained almost half a century ago:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). Therefore, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.*; *Dorantes*, 331 S.W.3d at 379.

First degree murder is described as "[a] premeditated and intentional killing of another . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

As pointed out by Defendant, our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or concealment of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *Jackson*, 173 S.W.3d at 409; *Nichols*, 24 S.W.3d at 302; *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660. One well-regarded treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003); *State v. Berry*, 141 S.W.3d 549, 566 (Tenn. 2004).

Defendant characterizes his challenge to the sufficiency of the evidence as a challenge to the State's proof of premeditation; however, we perceive it as a challenge to the credibility of the witnesses. Viewing the evidence in a light most favorable to the State, the proof at trial could lead a rational jury to conclude that Defendant shot the victim with premeditation. There were two versions of the events that occurred. Defendant insisted that he acted in self-defense because the victim was holding a gun in his left hand and pulled the gun on Defendant in a threatening manner. The State portrayed Defendant as an angry person who had threatened the victim prior to the shooting. The jury obviously rejected Defendant's claim of self-defense and accredited the State's version of the facts. The evidence was sufficient to establish premeditation. Dominique and the victim's mother testified that Defendant threatened to kill the victim prior to the shooting; the victim told his wife one week prior to his death that he was afraid of Defendant. The victim had been saving money so that he and Dominique could

move out of the house. The morning of the victim's death, the victim told Dominique that they needed to move out immediately because they had the money to do so. There was testimony that Defendant was mad at the victim on the morning of the incident, as evidenced by his saying "tick tock" to the victim and that he was upset that the door of the living room was blocked with furniture. Moreover, immediately before shooting the victim, Defendant told his mother, "It ain't right." Dominique heard his mother say, "Kervin, no" right before gunshots were fired. Defendant admitted that he quickly shot four or five times toward the victim's head and chest. The victim was hit at least twice in the head. The jury could have inferred by Defendant's actions and statements that he exercised reflection and judgment in forming the intent to kill the victim. Defendant's actions after the killing could be interpreted as calm. Dominique testified that she saw Defendant wipe off the silver and black gun and place the gun on the floor beside the victim's left hand. The victim's mother testified that the victim was right-handed, whereas Dominique testified that she had seen the victim write with both hands. Defendant walked out of the kitchen, put on his shoes, left the home and walked outside where he smoked a cigarette and used the restroom. Defendant testified that he was afraid after the shooting but told police he was "justified" when he was arrested. We determine that the evidence is sufficient for the jury to determine that the Defendant acted with premeditation. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE